**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL NO.  1:08CV318**

| | | |
|---|---|---|
| **SOUTHERN ALLIANCE FOR CLEAN ENERGY; ENVIRONMENTAL DEFENSE FUND; NATIONAL PARKS CONSERVATION ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL; and SIERRA CLUB,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **Vs.** | ) ) | **MEMORANDUM AND O R D E R** |
| **DUKE ENERGY CAROLINAS, LLC,** | ) ) | |
| **Defendant.** | ) ) | |
| _____ | ) | |

     **THIS MATTER** came on for hearing before the Court on the parties' respective motions for summary judgment and to dismiss on October 16, 2008.  After hearing argument of counsel and reviewing the materials submitted in support of these motions, this matter is now ripe for disposition.

## I. PROCEDURAL HISTORY

On July 16, 2008, the Plaintiffs filed a complaint against the Defendant Duke Energy Carolinas, LLC ("Duke"), alleging violations of the Clean Air Act ("the Act" or "CAA") by construction of Duke's new 800 megawatt coal fired power plant (Cliffside Unit 6) without first satisfying the Maximum Achievable Control Technology ("MACT") requirements of the Act. *See* **Clean Air Act § 112(g)(2)(B), 42 U.S.C. § 7412(g)(2)(B).**

On August 8, 2008, Plaintiffs filed their motion for summary judgment on liability and standing; Defendant followed with a motion to dismiss the action on August 11, 2008. *See* **Plaintiffs' Motion for Summary Judgment on Liability and Standing, and Supporting Memorandum, filed August 8, 2008; Defendant's Motion to Dismiss, and Supporting Memorandum, filed August 11, 2008.** Thereafter, the parties filed their respective responses and replies. *See* **Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment, filed August 25, 2008; Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss, filed August 28, 2008; Plaintiffs' Reply to Defendant's Response, filed September 8, 2008; Defendant's Reply to Plaintiffs' Response, filed September 12, 2008.**

On October 7, 2008, the Defendant moved to supplement the record; Plaintiffs did not oppose the relief sought, and the motion was granted. ***See* Order, filed October 8, 2008.** On October 15, 2008, the Defendant again moved to supplement the record, which the Plaintiffs oppose. While not previously granted by written order, Defendant's motion and attached materials were considered by the Court in reaching the decision on the parties' dispositive motions; therefore, Defendant's second motion to supplement the record will be allowed *nunc pro tunc* as of October 15, 2008.

## II. DEFENDANT'S MOTION TO DISMISS

Defendants argues the action must be dismissed because the Court lacks subject matter jurisdiction, the Plaintiffs lack standing to bring the suit, and due to the application of § 112(g). These arguments are addressed *seriatim*.

### A. Subject matter jurisdiction

In ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. The burden of proving subject matter

jurisdiction is on the party asserting jurisdiction.  If the
defendant contends that a complaint fails to allege facts upon
which subject matter jurisdiction can be based, all facts alleged
in the complaint are assumed to be true.  The plaintiff is then
afforded the same procedural protection as he would receive
under Rule 12(b)(6) consideration. . . .  A motion to dismiss
under Rule 12(b)(6) should be denied unless it appears beyond
doubt that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief.

*Jetform Corp. v. Unisys Corp.*, **11 F. Supp. 2d 788, 789 (E.D. Va. 1998)**

**(internal quotations and citations omitted).**  The Court may also

consider exhibits outside the pleadings "'to resolve factual disputes

concerning jurisdiction.'" *Smith v. Washington Metro. Area Transit*

*Auth.*, **290 F.3d 201, 205 (4th Cir. 2002) (quoting** *Williams v. United*

*States*, **50 F.3d 299, 304 (4th Cir. 1995)).**  The Court "is free to weigh all

the evidence in determining whether jurisdiction exists." *Hager v. First*

*Virginia Banks, Inc.*, **2002 WL 57249, at *4 (W.D. Va. 2002) (citing**

*Adams v. Bain*, **697 F.2d 1213, 1219 (4th Cir. 1982) and** *Mortensen v.*

*First Fed. Sav. & Loan Ass'n*, **549 F.2d 884, 891 (3d Cir. 1977)).**

Duke contends that Plaintiffs' action should be dismissed pursuant to

Fed. R. Civ. P. 12(b)(6) for failure to state a claim for relief "because it

seeks to impose retroactively a pre-construction requirement that did not

exist when the North Carolina Division of Air Quality ["DAQ"] issued a

Clean Air Act permit to construct Cliffside Unit 6 and Duke Energy commenced construction." **Defendant's Motion to Dismiss, at 1-2.** In addition, Duke contends Plaintiffs' complaint exceeds the Court's jurisdiction "by attempting a collateral attack upon an ongoing state permitting process." *Id.* **at 2 (citing Fed. R. Civ. P. 12(b)(1)).**

Duke correctly identifies the main issue to be decided in this case, that is, whether or not the requirements of § 112(g)(2)(B) apply to the ongoing construction of Unit 6. This is a question of law for the Court to decide in this litigation. The complaint clearly articulates this issue and Rule 12(b)(6) does not require dismissal. "[A] Rule 12(b)(6) motion tests only the sufficiency of the complaint. Unlike a summary judgment motion, a motion to dismiss limits the court's review to the pleadings; the court is not resolving the merits of the case. Applying this standard, this Court finds that defendant['s] motion to dismiss [Plaintiffs'] claim should be denied." ***Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Servs.*, 19 F. Supp. 2d 567, 573 (N.D. W. Va. 1998)**. Defendant's motion to dismiss pursuant to Rule 12(b)(1) alleging lack of subject matter jurisdiction fares no better. Properly construed, as Duke is well aware, Plaintiffs' complaint attacks Duke's failure to comply with

requirements of federal law and accompanying regulations, not DAQ's permitting process.

Duke does not dispute that § 112(g)(2)(B) and 40 C.F.R. § 63.40(b) require pre-construction approval of a project where EPA rules are in effect at the time a construction permit is issued and construction begins. The Regulations provide:

> The requirements [for § 112 MACT determinations] apply to any owner or operator who constructs or reconstructs a major source of hazardous air pollutants after the effective date of section 112(g)(2)(B) (as defined in § 63.41) and the effective date of title V permit program in the State or local jurisdiction in which the major source is . . . located . . . or the owner or operator of such major source has received all necessary air quality permits for such construction or reconstruction project before the effect date of section 112(g)(2)(B).

**40 C.F.R. § 63.40(b); *see also*, 40 C.F.R. § 63.43(c)(2).**

The Act clearly prohibits a party from "construct[ing] or reconstruct[ing] any major source of hazardous air pollutants [HAP], unless the Administrator [of the EPA] (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met." **42 U.S.C. § 7412(g)(2)(B); see also 15A N.C. Admin. Code 2D.1112(a) (which is North Carolina's equivalent of the §**

**112(g) rule that similarly "applies to the construction or reconstruction of major sources of hazardous air pollutants").**

The CAA defines "major source" as a source "that emits *or has the potential to emit* considering controls, in the aggregate, 10 tons per year or more of any [HAP] or 25 tons per year or more of any combination of [HAPs]." **42 U.S.C. § 7412(a)(1) (emphasis added).** Section 63.41 of the Regulations defines "construct a major source" in great detail and leaves no doubt that the Cliffside Unit 6 is included. *See* **40 C.F.R. § 63.41.** North Carolina defines "construction of a major source" as meaning to "fabricate, erect, or install at any developed site a new process or production unit which in and of itself emits or *has potential to emit* 10 tons per year of any HAP or 25 tons per year of any combination of HAP[.]" **15A N.C. Admin. Code 2D.1112(c)(4)(B) (emphasis added).**

HAP emissions were initially regulated under the CAA § 112 in 1970. In 1990, seeking to "avoid risk of serious, irreversible damage to human health," Congress amended the section to classify almost 200 contaminants as hazardous and provided a national pollution control program. **Plaintiffs' Memorandum in Opposition, at 2 (citing S. Rep. No. 101-228 (1989)).** The EPA was required to list the major sources of

HAPs and develop standards for their control referred to as "maximum achievable control technology" for each listed category. *Id.*; *see also*, **42 U.S.C. § 7412(c), (d).** On December 20, 2000, following a comprehensive study, the EPA added coal and oil-fired electric generating units (EGUs) to the list of polluting source categories that must meet CAA § 112 requirements. *Id.* **at 3;** *see also,* **65 Fed. Reg. 79,825, 79,830-31 (Dec. 20, 2000).**

In 2005, EPA sought to remove power plants from the § 112(c) list. **70 Fed. Reg. 15,994 (Mar. 29, 2005).** In deciding to delist coal-fired power plants, EPA failed to follow the requirements of 42 U.S.C. § 7412(c)(9)(B). EPA's action was immediately challenged by several environmental groups on the grounds that the delisting requirements of § 7412(c)(9)(B) had not been met. On February 8, 2008, the D. C. Circuit Court of Appeals reversed and vacated the attempted delisting by the EPA Administrator. *See New Jersey v. EPA*, **517 F.3d 574, 583 (D.C. Cir. 2008) ("Accordingly, in view of the plain text and structure of section 112, we grant the petition and vacate the Delisting Rule.").** The Court further held:

> EPA thus concedes that if EGUs *remain listed under section 112, as we hold*, then the CAMR[1] regulations for existing sources must fall.

*Id.* **(emphasis and footnote added);** *see also***, *Nat'l Fuel Gas Supply Corp. v. F.E.R.C.***, 59 F.3d 1281, 1289 (D.C. Cir. 1995) ("In sum, the decision of a federal court must be given retroactive effect regardless whether it is being applied by a court or an agency.");** *Harper v. Virginia Dep't of Taxation***, 509 U.S. 86, 97-98 (1993);** *James B. Beam Distilling Co. v. Georgia***, 501 U.S. 529, 540 (1991) ("[T]he question is whether it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so.  We hold that it is[.]").**  This Court concludes, therefore, that EGUs, including Defendant, remain listed under § 112 and subject to its provisions.  This Court concludes that § 112(g)(2)(B) and 40 C.F.R. § 63.40(b) were in effect at the time Duke began its construction of Cliffside Unit 6 and the completion of a MACT process was required before construction began.

As early as June 2005, Duke undoubtedly knew that the delisting of EUGs was being challenged and that the required delisting procedure had not been followed by the EPA.  ***See* Exhibit 6, Letter dated June 17,**

---

[1] Clean Air Mercury Rule.

**2005, from Southern Environmental Law Center to B. Keith Overcash,**

**Director of North Carolina Division of Air Quality, *attached to***

**Plaintiffs' Memorandum in Support of Summary Judgment.**

On January 29, 2008, ten days before the *New Jersey* decision was issued, the North Carolina DAQ issued an air quality permit to Duke authorizing the construction and operation of Unit 6.  ***See* Exhibit 8, Letter dated January 29, 2008, to Rick R. Roper of Duke Energy from DAQ, *attached to* Plaintiff's Memorandum in Support of Summary Judgment.**  Duke does not contend that at that time, or at any time before the permit was issued, a § 112 MACT proceeding had occurred. Nevertheless, Duke contends construction on the project began on January 30, 2008; Plaintiffs contend the construction actually began on February 9, 2008.  Whatever the correct beginning date, construction has continued to the present date, without interruption.

On June 2, 2008, the DAQ wrote Duke regarding the D. C. Circuit's opinion overturning the EPA's CAMR.

> [O]pinions differ about whether the ruling affects a previously
> issued permit under which construction has begun but is not
> completed. . . . [The] DAQ has concluded that a formal public
> process consistent with [CCA § 112] should now be initiated to

ensure that the permit contains the most stringent limits that
are in fact achievable.

. . .

Since the Delisting Rule has been vacated, it is clear that
EGUs are now on the § 112(c) list.  If DAQ were *now* to issue a
construction permit for a covered new EGU, that new unit
would be subject to CAA § 112(g) case-by-case emission
limitations for hazardous air pollutants.

. . .

DAQ believes that the best course of action is to initiate a
public process now, consistent with the standards in § 112, to
determine the maximum degree of reduction in emissions of
HAPs that is achievable for the category of source in which Unit
6 falls, consistent with the analyses that would apply under §
112.  If that process results in limits more stringent than those
in the existing permit, then DAQ would modify the permit to
incorporate those limitations.

In order to expedite this process, DAQ suggests that Duke
agree at the outset to the public process described above and
affirm that DAQ is entitled to modify the existing permit to
include the limits ultimately determined by the process,
provided they are more stringent than limits currently in the
permit.

**Exhibit 12, Letter dated June 2, 2008, to Rick R. Roper of Duke Energy from DAQ, *attached to* Plaintiff's Memorandum in Support of Summary Judgment; *see also* Exhibit 5, *attached to* Defendant's Memorandum in Support of Motion to Dismiss.**  DAQ asked Duke to

agree to the public process described, to affirm its authority to modify the

existing permit, and to make a commitment that Duke would not contend

that "any ongoing construction must or should be considered when

determining appropriate [HAP] limits[.]" *Id*. In response, Duke contended that a case-by-case § 112(g) was not required for Unit 6, but that it would agree to provide a "MACT assessment" to DAQ by the end of June 2008, "without waiving any of its rights." **Exhibit 13, Letter dated June 13, 2008, to DAQ from Duke Energy,** *attached to* **Plaintiff's Memorandum in Support of Summary Judgment.**

On July 3, 2008, Duke advised DAQ that it was providing a "voluntary submittal . . . for a [MACT] Assessment on Cliffside Unit 6[.]" **Exhibit 14, Letter dated July 3, 2008, to DAQ from Duke Energy,** *attached to* **Plaintiff's Memorandum in Support of Summary Judgment.** Duke also stated that it understood that "North Carolina's [DAQ] will now undertake a review of this submittal consistent with DAQ's process for performing a § 112(g) MACT determination. [Duke] intends to participate fully in that *MACT-like process*." *Id.* **(emphasis added).**

Enclosed with the July 3 letter was Duke's own analysis of "MACT-equivalent emission limitations" for the Cliffside Unit 6. *See* **Exhibit 9,** *attached to* **Plaintiffs' Memorandum in Support of Summary Judgment.** Contained within the document is Duke's continued refusal to submit to a full public MACT process as required by § 112 of the CAA.

> While this Assessment is not required by § 112 of the Clean Air Act, it is being submitted to determine levels of control for HAPs that is intended to be functionally modeled on the § 112 process as a "MACT-like" process, which [Duke] has agreed to undertake at the request of DENR. References in this document to "MACT" or "MACT requirements" or similar topics are not to be taken in contravention of this being a "MACT-like" process, rather than one required under § 112.

*Id.* **at 2 n.1.**

On October 14, 2008, Duke sent another letter to DAQ which continued to assert that § 112(g) requirements did not apply to Duke. ***See*** **Exhibit A, Letter dated October 14, 2008, to DAQ,** *attached to* **Defendant's Second Motion to Supplement the Record, filed October 15, 2008.** This letter refers to the July 3 letter and previous submittal and provides a "revised HAPs emissions determination with documentation for [DAQ's] review to demonstrate that no MACT or MACT-like requirements – whether mandatory or voluntary – apply to this *minor* source of HAPs. Our position remains, as we advised you in June, that Section 112(g) does not apply to a unit such as [Unit 6], . . . . [O]ur calculations demonstrate that [Unit 6] is not a *major* source of HAPs, which means that Section 112(g) does not apply regardless of when construction commenced." *Id.* **at 1-2 (emphasis in original).** In short, Duke continues to alter the original

submission and has yet to participate in a full MACT, case-by-case procedure with full opportunity for public scrutiny.

Neither party has provided the Court with any reference in the CAA or the North Carolina Clean Smokestack Act which provides for a "MACT-like" or "MACT equivalent" proceeding.  ***See* N.C. Gen. Stat. §§ 143-215.107D – 143.215.111.**  The Court finds no reason to substitute a suggested process for that required under existing law.  When a source category is listed, that is, an EGU, and is, therefore, subjected to the requirements of § 112, it must control to "the maximum degree of reduction in emissions of the hazardous air pollutants, subject to this section (including a prohibition on such emissions, where achievable)[.]" **42 U.S.C. § 7412(d)(2).**  This leaves no doubt as to the degree to which Congress sought to protect the public health and welfare by reducing or ultimately prohibiting the emission of HAPs.  Whether Unit 6 is, or will be, at best a "minor source" of pollution, as Defendant alleges, and not a "major source" of HAPs has yet to be determined in the appropriate proceeding required by § 112(g)(2)(B), 42 U.S.C. § 7412(g)(2)(B).

In weighing all the evidence before the Court, including the allegations set forth in Plaintiffs' complaint as well as those contained in

the parties' motions and supporting affidavits and memoranda, the Court concludes it has subject matter jurisdiction in this case. **42 U.S.C. § 7604(a);** *see also***, 28 U.S.C. § 1331 (federal question jurisdiction, generally).**

## B.    Standing

Defendant also contends the Plaintiffs have no standing to pursue their claims in this Court. In making that determination, "the standing inquiry focuses on whether the plaintiff[s] [are] the proper par[ties] to bring this suit[.]" *Raines v. Byrd***, 521 U.S. 811, 818 (1997).** Even though the Court may "ultimately determine that [Plaintiffs] have not established a right to relief, that does not mean that they have not alleged a cognizable injury sufficient to cross the threshold of justiciability." *Natural Res. Def. Council, Inc. v. EPA* **(D.C. Cir. 1994).** Allegations based on injury to "aesthetic and recreational values" will support standing. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.***, 528 U.S. 167, 181-83 (2000).**

> An individual plaintiff has standing under the Constitution's case-or-controversy limitation, Art. III, § 2, where "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.". . .  An association "has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Sierra Club v. Tennessee Valley Auth.*, **430 F.3d 1337, 1344 (11ᵗʰ Cir. 2005) (quoting** *Laidlaw*, **at 180-81) (other citations omitted).**  Although the *Sierra Club* action concerned the Clean Water Act, the Fourth Circuit has discussed the rights of an individual claimant-participant in a suit brought by a nonprofit environmental organization.  *See Friends of the Earth, Inc. v. Gaston Copper Recycling*, **204 F.3d 149 (4ᵗʰ Cir. 2000) (Wilkinson, C.J.).**

The Plaintiffs here are nonprofit organizations consisting of numerous individuals who have the right to pursue individual claims for alleged injuries suffered or will suffer to their health, aesthetic and recreational interests.  *See* **Plaintiffs' Exhibits 15-29,** *attached to* **Memorandum in Support of Summary Judgment.**  Their statements are made under penalty of perjury and contend their injuries are actual or

imminent absent a MACT compliance with the requirements of the CAA and DAQ standards for HAPs control. They also contend that these injuries would be redressed by Unit 6 compliance with applicable law. *Sierra Club*, **430 F.3d at 1344.**

For the reasons stated above, the Court concludes the Plaintiffs have standing to pursue their claims in this Court.

## C.    Abstention

Finally, Defendant contends that this Court should dismiss the action or, in the alternative, abstain from interference because the action constitutes a collateral attack on DAQ's "ongoing review of Duke Energy's MACT assessment."  **Defendant's Memorandum in Support of Motion to Dismiss, at 20.**

There is no ongoing review of a MACT assessment.  There has been no opportunity for DAQ to hear and consider the opinions of experts such as Ranajit Sahu, Ph.D., Mechanical Engineering, California Institute of Technology, or any other expert opinion evidence as that set forth in Plaintiffs' exhibits submitted in support of their motion for summary judgment.  ***See, e.g.*, Exhibit 2, Declaration of Ranajit Sahu, *attached to***

**Plaintiffs' Memorandum in Support of Summary Judgment.**  As noted above, Duke Energy has refused to engage in a full MACT process or give certain assurances in response to the DAQ request.  Therefore, DAQ is not presently requiring a MACT process involving Duke.  The question as to "retroactive application" of § 112 to this litigation has not been finally addressed by the DAQ.  There is also the desirability, if not the necessity, of determining with finality that a MACT process must be pursued by the Defendant.  The ongoing construction without a prior determination of Duke's compliance with the CAA requirements could result in HAPs emissions capable of causing serious health problems, or the shut down of construction and/or in costly retrofitting that would result in unnecessary rate increases.

It is worthy of note that § 113(b) authorizes the Administrator to "commence a civil action" in order "to restrain" CAA violations, "to require compliance" with CAA, to assess civil penalties up to $25,000 per day," and "to award any other appropriate relief."  **42 U.S.C. § 7413(b).**  The grant of equity jurisdiction is broad and enables the Court to "retain inherent authority to award any equitable remedy that is not expressly taken away from [it] by Congress."  ***Meghrig v. KRC Western, Inc.*, 516**

**U.S. 479, 487 (1996).**  An immediate involvement in a public MACT

process by Duke will be required by this Court.

Federal courts may "entertain suits" to enforce the requirement of a

CAA permit even though the EPA has approved a state implementation

plan.  **See Weiler v. Chatham Forest Products, Inc., 392 F.3d 532, 539**

**(2d Cir. 2004).**  Abstention would be improper in this case for reasons

previously noted.  "The issue in an abstention case is not so much whether

the dispute can be resolved in a state forum (assuming one is available),

but rather whether for some special reason a federal court *cannot, or*

*should not*, resolve it."  **Three Rivers Cablevision, Inc. v. City of**

**Pittsburgh, 502 F. Supp. 1118, 1123 (W.D. Pa. 1980) (emphasis added).**

"When a Federal court is properly appealed to in a case over which it has

by law jurisdiction, it is its duty to take such jurisdiction[.]" **Willcox v.**

**Consol. Gas Co. of New York, 212 U.S. 19, 40 (1909) (internal citation**

**omitted).**

"Considering that '[f]ew public interests have a higher claim upon the

discretion of a federal chancellor than the avoidance of needless friction

with state policies,' the usual rule of comity must govern the exercise of

equitable jurisdiction by [this Court] in this case."  **Alabama Public Serv.**

*Comm'n v. Southern Ry. Co.*, **341 U.S. 341, 350 (1951) (quoting**

*Railroad Comm'n of Tex. v. Pullman Co.*, **312 U.S. 496, 500 (1941)).**

Keeping this in mind, the Court will retain jurisdiction to enforce a federal

law if necessary, but deny Plaintiffs' injunctive relief at this time to provide

an opportunity for DAQ to proceed with the MACT process.

Therefore, the Court denies the Defendant's motion to dismiss the

case on the grounds that it constitutes an improper collateral attack on

North Carolina's DAQ permit process or that abstention would be proper or

required under the doctrine announced in *Burford v. Sun Oil Co.,* 319 U.S.

315 (1943).

### III.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**A.    Standard of Review**

Summary judgment is appropriate when there is no genuine issue of

material fact, and judgment for the moving party is warranted as a matter

of law.  **Fed. R. Civ. P. 56(c).**  "A genuine issue [of fact] exists 'if the

evidence is such that a reasonable jury could return a verdict for the

nonmoving party.'"  ***Shaw v. Stroud***, **13 F.3d 791, 798 (4th Cir. 1994)**

**(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).**  In

considering a motion for summary judgment, the Court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.*

By reviewing substantive law, the Court may determine what matters constitute material facts. *Anderson*, **477 U.S. at 248.** "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "The party seeking summary judgment has the initial burden to show a lack of evidence to support the nonmoving party's case." *Shaw*, **13 F.3d at 798.** If that showing is made, the burden then shifts to the nonmoving party who must convince the court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat a motion for summary judgment. *Id.*

## B.    Discussion

The Plaintiffs' motion for summary judgment on liability is allowed for the reasons previously discussed by the Court in denying the Defendant's motion to dismiss and for the following additional reasons.

Cliffside Unit 6 is an EGU under construction which has the potential to emit in excess of ten tons per year of an individual HAP (hydrochloric

acid) and over 25 tons of a combination of other HAPs. As such, it is subject to the requirements of § 112 of the CAA. **42 U.S.C. § 7412(a)(1).** It also has the potential of emitting various quantities of other HAPs regulated by the CAA such as mercury and other listed pollutants. As of this date, neither the EPA or DAQ (North Carolina's authority delegated with enforcing § 112) has issued to Duke an Air Quality Permit recognizing compliance with § 112. ***See* Exhibits, *attached to* Defendant's Second Motion to Supplement the Record and Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, *supra*.** As a result, Defendant is continuing with the construction of Unit 6 without the required § 112 MACT determination. ***See* 42 U.S.C. § 7412(g)(2)(B).** The material facts herein are not in dispute. Duke is simply refusing to comply with controlling law.

The Plaintiffs are environmental organizations consisting of members who themselves have standing to bring this action. ***See* Exhibits 15-29, *attached to* Plaintiffs' Memorandum in Support of Summary Judgment; Complaint.** The individuals set forth a variety of interests they enjoy which they contend are at risk and germane to the purposes of the organizations of which they are members. The claims asserted by the

organizations and the relief sought do not require the participation of individual members. The members show that they will suffer injuries to recreational, aesthetic, and health interests. These injuries are concrete and particularized, actual or imminent, not conjectural or hypothetical, are fairly traceable to Defendant's challenged actions, and more likely than speculative that the injuries will be redressed by a favorable decision. *Sierra Club*, **440 F.3d 1344;** *see also*, *Laidlaw*, **528 U.S. at 180-81.**

As previously discussed herein, the Court concludes Plaintiffs have standing to bring this action. They have identified the inadequacies which they contend result from the "MACT-like" assessment performed by the Defendant. *See* **Exhibit 2, Sahu Declaration,** *supra*, **at 11-19.** Such evidence, as well as other proper evidence, should be considered in a MACT process open to the general public and not confined to the evidence mentioned by Dr. Sahu. *Id*.

Plaintiffs contend Defendant's "MACT-like process" is inadequate in a variety of ways and as a result fails to meet compelling requirements of federal and state laws. **Plaintiffs' Memorandum in Support of Summary Judgment, at 17-20.** What a properly conducted MACT process will show

is not now before the Court and must be conducted before and by the appropriate regulatory agency.

Plaintiffs request the Court grant an immediate injunctive relief in the form of a halt to further construction of Unit 6 until a MACT process, conducted in accordance with current legal requirements, is completed. While such a drastic measure is justified by Defendant's refusal to comply with the plain requirements of current law, the Court concludes that Defendant should be given the opportunity to comply with CAA and DAQ requirements within a limited period of time, after which injunctive relief may be granted, if necessary.

In reaching these conclusions, the Court has considered the voluminous documentation presented by both parties "outside the pleadings . . . and not excluded by the court[.]" **Fed. R. Civ. P. 12(d)**. The parties have been given ample opportunity to present all relevant material they chose to share and Rule 56 is appropriate.

The current law required a full case-by-case type MACT process be conducted before construction of Unit 6 began. As of this date, the process has not begun. Therefore, Plaintiffs' motion for summary judgment as to standing and liability will be allowed.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motions to dismiss are **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's second motion to supplement the record is **ALLOWED** *nunc pro tunc* as of October 15, 2008.

**IT IS FURTHER ORDERED** that the Plaintiffs' motion for summary judgment on liability and standing is **ALLOWED**.

A Judgment incorporating the findings herein is filed herewith.

Signed: December 2, 2008

Lacy H. Thornburg
United States District Judge